IN RE GUARDIANSHIP OF ROBERT D., A MINOR.
LISA M., APPELLEE, V. PATRICK D. AND KATHRYN D.,
APPELLEES, AND ROBERT D., APPELLANT.
696 N.W.2d 461

Filed May 20, 2005.   No. S-04-973.

Michael T. Varn for appellant. ·

Brenda L. Bartels, of Douglas, Kelly, Ostdiek, Bartels & Neilan, P.C., for appellee Lisa M.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

Robert D., a minor child, by and through appointed counsel, appeals from the order of the county court terminating the guardianship of Patrick D. and Kathryn D., his maternal grandparents, and ordering Robert returned to the custody of Lisa M., his biological mother. The issues presented in this appeal are whether the court erred in concluding that Lisa had not forfeited her superior parental right to custody of Robert, refusing to permit Robert to testify at the guardianship termination hearing, and failing to appoint counsel to represent Robert until after entry of the order terminating the guardianship. We find no reversible error and affirm the judgment of the county court.

## BACKGROUND

### PROCEDURAL HISTORY

Robert was born on April 28, 1990. Lisa was 16 years old at the time of Robert's birth. On May 3, Patrick and Kathryn filed a petition in the county court for appointment of a guardian for Robert. Specifically, Patrick and Kathryn sought to be appointed coguardians for Robert. The petition alleged that "it is very important that the co-guardians be·appointed because of the

necessity of immediately having said minor covered for medical insurance on the medical insurance" of Patrick and Kathryn. Lisa also signed the petition, affirming that the allegations in the petition were true. Robert's biological father is not mentioned in these filings, and his identity is not relevant to this appeal.

On May 31, 1990, the county court entered an order appointing Patrick and Kathryn coguardians of Robert. The order provided that "[a]ll parental rights of custody over the minor have been terminated or suspended by circumstances or prior court order." The basis for this provision is not apparent from the record, and the parties agree that no formal or legal termination of Lisa's parental rights took place.

On May 4, 2004, Lisa filed a motion to terminate Patrick and Kathryn's guardianship of Robert. The motion alleged that Lisa had been misled into signing the guardianship, believing it was simply for insurance reasons. The motion further alleged that Patrick and Kathryn had promised to terminate Robert's guardianship on numerous occasions, but had failed to do so, and refused to allow Robert to spend time with Lisa and her family. Lisa alleged that Robert was not receiving proper care from Patrick and Kathryn and that it was in Robert's best interests that the guardianship be terminated.

In response, Patrick and Kathryn denied Lisa's allegation that she had been misled into signing the consent to the guardianship. They also denied promising to terminate the guardianship. They alleged that Lisa had been afforded "reasonable visitation" and that Robert was satisfied with the frequency of visitation Lisa had been permitted. They alleged that Robert did not want the guardianship terminated and did not wish to live with Lisa.

On July 16, 2004, the matter came on for hearing. The evidence adduced at the hearing will be summarized below. On July 29, the court entered an order terminating Patrick and Kathryn's guardianship. The court found that Lisa did not understand her consent to the guardianship to be a termination or suspension of her parental rights. The court found that at the time the guardianship was ordered, Lisa, Patrick, and Kathryn understood that the purpose of the guardianship was to provide health insurance for Robert. The court concluded that the guardianship order may have been voidable, but was not void.

However, the court also found no evidence that Lisa was unfit to be a parent, noting that she was a fit and proper parent to four other children, Robert's half-siblings. The court further determined that Lisa had not forfeited her parental rights to custody, finding that Lisa

> was at all times willing and able to be a mother to Robert . . . . Unfortunately, Patrick and Kathryn . . . decided they would be better parents than their own daughter, and refused to return Robert . . . to Lisa . . . . Unfortunately, such a decision has estranged Robert . . . from his own mother, but even more unfortunately, has prevented Robert from enjoying a childhood with his half brothers, and all the benefits that memories of a childhood shared with four brothers would provide.

Citing *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004), the court concluded that "[a]bsent proof of unfitness or forfeiture [of] custody rights, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent." Thus, the court terminated the guardianship and ordered Robert's reunification with Lisa.

### HEARING EVIDENCE

Lisa testified that she had been living for 9 years in Alliance, Nebraska, with her husband of 12 years, Randy M., and their four sons. Lisa stated that at the time of Robert's birth, she was living in Alliance with Patrick and Kathryn. Lisa testified that when she signed the consent to guardianship in 1990, she had been told that it was to cover Robert's medical costs, and she only found out later that she had signed guardianship papers. At the time, Lisa was not employed, and her parents had medical insurance available for Robert.

Lisa continued to live with her parents until she married in June 1992. Robert stayed with Patrick and Kathryn during Lisa and Randy's honeymoon, and when they returned, Robert moved to Scottsbluff, Nebraska, with Lisa and Randy. Robert then moved with Lisa and Randy to North Platte, Nebraska. Lisa testified that in 1993, her grandfather was ill and wanted to spend time with Robert. On June 7, 1993, Patrick and Kathryn visited Lisa and

Randy in North Platte, and Robert went with Patrick and Kathryn to their home in Alliance. Lisa said that even at that point, she did not understand that Patrick and Kathryn were Robert's guardians. Lisa and Randy stayed in North Platte for roughly 1½ years, and then they moved back to Alliance.

Lisa stated that she became aware of the legal effect of the guardianship only after her grandfather's death, when she asked Kathryn to pack Robert's belongings so he could return to Lisa's home. Lisa said that Kathryn told her, at that point, that Lisa could not take Robert because of the guardianship.

Kathryn testified that the guardianship had been fully explained to Lisa before it was ordered and that Lisa indicated she understood. Patrick also testified that the guardianship had been explained to Lisa. Kathryn denied any discussion of insurance with Lisa. Kathryn explained that she did not understand the effect of the guardianship at the time that Lisa was married and felt it was important for Robert to be with Lisa. Kathryn said she had understood the appointment of "co-guardians" to mean that she, Patrick, and Lisa would all take care of Robert together. After she and Patrick had picked Robert up in North Platte, however, they had the guardianship documents examined by a lawyer, who, according to Kathryn, told Kathryn and Patrick that they were Robert's legal guardians and that Robert needed to stay with them. Patrick said that his understanding from the outset had been that he and Kathryn would be the caretakers for Robert.

Lisa testified that after moving back to Alliance, she had a great deal of normal family interaction with Robert. She testified that they had been shopping on many occasions and that she purchased clothes for him to start preschool. Lisa admitted that she had not provided her parents with money to support Robert, but also said that they had not requested any support. Lisa stated that Robert spent holidays with her family. Lisa testified that they had interacted with Robert through school activities, attending Robert's band concerts and school programs. Lisa testified at length regarding the activities and games she and Randy played with Robert and their other children. Lisa said:

> I have tried to be involved in every part of his life. I wanted to be there for the first day of preschool, didn't know when it was. I wanted to be there for the first day of kindergarten,

didn't know when it was. I have tried very hard to keep in touch with him, let him know how his brothers are doing, let him know how things are going with the family.

Lisa explained that Kathryn had prevented her from attending Robert's parent-teacher conferences and that Robert's school refused to provide Lisa with information about Robert because of the guardianship.

Lisa said that she had become estranged from her parents about 6 months before the hearing, after another family custody dispute, between two of Lisa's siblings. Lisa said that as a result, she had not been able to spend a lot of time with Robert. Lisa testified regarding several specific instances in which she was denied visitation with Robert. Lisa said that since she filed her motion to terminate the guardianship, she had been unable to visit with Robert beyond the court-ordered visitation. She also said that when she tried to telephone her parents for more visitation, she "seem[ed] to get a machine." Lisa testified at length regarding her concerns that Patrick and Kathryn were not properly caring for Robert.

Kathryn agreed that Lisa had been allowed to visit liberally with Robert until the last few months before the hearing. Kathryn testified that the family situation had deteriorated because of charges she said Lisa had filed against Patrick. However, Kathryn stated that she had not thought there had been a problem with visitation. Kathryn said that on some occasions, as Robert had become older, he had chosen not to visit on the occasions Lisa had requested, and that Patrick and Kathryn felt that at Robert's age, they should honor his wishes. Kathryn testified that she had never forbidden contact between Lisa and Robert and that Lisa had always "been more than welcome." Kathryn claimed that Lisa had not frequently sought information about what was going on with Robert or when his school events were.

Lisa testified that she had not asked the court to terminate the guardianship sooner because she had talked to Patrick "[m]any times over the years" and had believed his assurances that he would have the guardianship terminated. Lisa said that it was her understanding that Kathryn opposed terminating the guardianship. Randy testified that he had been present when Patrick had told Lisa that Patrick would terminate the guardianship and that

Patrick had also made statements to Randy to the same effect. Randy said that Patrick had indicated a willingness to terminate the guardianship, but that Patrick always said he would " 'have to check with Kathy.' "

Kathryn claimed, however, that Lisa had not asked about Robert's return since Lisa and Randy were first married. Kathryn said that at that time, they did not know much about Randy, and that she and Patrick needed to make sure that the marriage would last. Patrick testified that Lisa had asked about terminating the guardianship, "five or six years ago maybe." Patrick said he told Lisa that he would consider it, but that he never promised to end the guardianship.

Lisa also said that she felt uncomfortable challenging her parents, because she had a strong relationship with her family, and that she had felt she would be causing problems if she sought to have the guardianship terminated. Lisa explained that it took her 11 years to challenge her parents because she had trusted them. She said that she wanted to parent Robert all along, but had "come to the reality that Mom and Dad are not going to do this upon my request." Lisa also explained that it had been only recently that she had obtained the money to hire an attorney to pursue the matter. Randy said that they had waited 11 years because they had tried to work things out peacefully with Patrick and Kathryn and that "the last thing [Lisa] wanted to do" was have to go to court and "cause any hurt to her parents."

### REPRESENTATION OF ROBERT

Prior to the hearing, on June 1, 2004, Patrick and Kathryn filed a motion for the court to consider the appointment of an attorney to represent Robert's interests. The motion alleged that Robert, then age 14, "has stated to counsel that he objects to the termination of the guardianship, and the interests of the minor may be best represented by counsel specifically appointed to represent the minor." The court appointed a guardian ad litem for Robert prior to the hearing on Lisa's motion.

At the beginning of the hearing, the guardian ad litem sought clarification as to what his role would be. The guardian ad litem said that "[a]s guardian ad litem, typically I would not ask questions . . ." but that "[o]n the other hand, [Robert] is 14 and I could

have been appointed as attorney for him." In response, the court stated that "the guardian ad litem should also perform the duties of counsel for the juvenile and to express and advocate for his desires, so if that would require that you do some questioning, we'll have you do some questioning."

At the hearing, counsel for both sides indicated that they intended to question Robert. However, the court found no relevancy in Robert's testimony, as the only issue to be determined at the hearing was whether Lisa's parental rights had been forfeited. Over Patrick and Kathryn's objection, the court refused to permit Robert to testify. The guardian ad litem also indicated that he believed Robert's preferences were relevant to the issues presented and made an offer of proof that Robert preferred to remain with Patrick and Kathryn.

After entering the order terminating the guardianship, on August 24, 2004, the court entered an order appointing different counsel to represent Robert directly, as opposed to as a guardian ad litem. Through that counsel, Robert appeals from the order terminating his guardianship.

## ASSIGNMENTS OF ERROR

Robert assigns that the court erred in (1) determining that Lisa had not forfeited her rights to custody of Robert by substantial, continuous, and repeated neglect of Robert and a failure to discharge the duties of parental care and protection; (2) refusing to either interview Robert to determine his wishes or allow him to testify at the hearing; and (3) failing to appoint an attorney to represent Robert until after the hearing on the motion to terminate the guardianship and after the court entered its order terminating the guardianship.

## STANDARD OF REVIEW

Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 1995 & Cum. Supp. 2004), are reviewed for error on the record. *In re Estate of Jeffrey B.*, 268 Neb. 761, 688 N.W.2d 135 (2004). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

■ Because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. § 27-401 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion. *In re Estate of Jeffrey B., supra.* Whether a child witness should be permitted to testify is also committed to the discretion of the trial court. See, *Beran v. Beran,* 234 Neb. 296, 450 N.W.2d 688 (1990); *Krohn v. Krohn,* 217 Neb. 158, 347 N.W.2d 869 (1984); *State v. Hitt,* 207 Neb. 746, 301 N.W.2d 96 (1981). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Robb v. Robb,* 268 Neb. 694, 687 N.W.2d 195 (2004).

## ANALYSIS

■ This is a proceeding by a biological parent, Lisa, to terminate a guardianship with respect to her child, Robert. Under the parental preference principle, a parent's natural right to the custody of his or her child trumps the interests of strangers to the parent-child relationship and the preferences of the child. *In re Guardianship of D.J.,* 268 Neb. 239, 682 N.W.2d 238 (2004). Absent circumstances which terminate a parent's constitutionally protected right to care for his or her child, due regard for the right requires that a biological or adoptive parent be presumptively regarded as the proper guardian for his or her child. *Id.*

■ Consequently, in guardianship termination proceedings involving a biological or adoptive parent, the parental preference principle serves to establish a rebuttable presumption that the best interests of the child are served by reuniting the minor child with his or her parent. *Id.* In other words, an individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent either is unfit or has forfeited his or her right to custody. *Id.* Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent. *Id.*

### FORFEITURE OF PARENTAL RIGHTS

■ Robert first argues that the evidence presented at the hearing established that Lisa forfeited her parental rights. Generally, parental rights may be forfeited by a substantial, continuous, and

repeated neglect of a child and a failure to discharge the duties of parental care and protection. *Id.*

However, guardianships are designed to temporarily relieve parents of the rigors of raising a child. *Id.* Thus, the nature of a guardianship makes it particularly inappropriate to establish the forfeiture of parental rights by solely focusing on a parent's failure to discharge the duties of parental care and protection. There must also be clear and convincing evidence of substantial, continuous, and repeated neglect of a child. *Id.* This may be established by the complete indifference of a parent for a child's welfare over a long period of time. See *id.*

The record, as summarized above, does not establish such neglect or indifference. Although there was some conflict in the testimony, the record establishes beyond dispute that Lisa made substantial and repeated efforts to maintain a relationship with Robert throughout the guardianship. Compare *id.* The county court's determination that Lisa did not forfeit her parental rights is supported by competent evidence.

The primary concern in this case is not the level of interest Lisa maintained in Robert, but the length of time that the guardianship was permitted to continue before Lisa sought Robert's return. The length of a guardianship is not irrelevant to a determination of neglect or indifference, and there may be circumstances in which duration and disinterest combine to produce clear and convincing evidence of substantial, continuous, and repeated neglect. However, such circumstances are not present here. Lisa explained the reasons that Patrick and Kathryn's guardianship was allowed to persist, and the county court, having heard and observed the witnesses, concluded that Lisa was a willing parent whose wishes were frustrated by Patrick and Kathryn. The credibility of witnesses and the weight to be given their testimony are for the trier of fact. *In re Application of Jantzen*, 245 Neb. 81, 511 N.W.2d 504 (1994). Here, the court credited Lisa's testimony with respect to her delay in challenging the guardianship, and the court's determination was not arbitrary, capricious, or unreasonable.

### Testimony of Minor Child

Robert next argues that the court erred in refusing to interview him or permit him to testify at the hearing. Robert relies on the

general principle that in determining custody arrangements, one of the factors a court should consider is the desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning. Neb. Rev. Stat. § 42-364(2)(b) (Reissue 2004). While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002).

However, this is not a custody dispute between two parents. Rather, as previously noted, this is a guardianship termination proceeding involving a biological parent, and under the parental preference principle, "a parent's natural right to the custody of his or her children trumps the interest of strangers to the parent-child relationship *and the preferences of the child.*" (Emphasis supplied.) *In re Guardianship of D.J.*, 268 Neb. 239, 244, 682 N.W.2d 238, 243-44 (2004). Furthermore, as discussed above, the issue to be decided in this proceeding was whether Lisa had forfeited her parental rights. The county court did not err in determining that Robert's preferences about where to live were not relevant to the issues before the court at the hearing on Lisa's motion to terminate the guardianship.

Robert cites *State ex rel. Cochrane v. Blanco*, 177 Neb. 149, 128 N.W.2d 615 (1964), for the proposition that a child's wishes are relevant in a guardianship termination proceeding. That case did not involve the termination of a guardianship, but was a habeas corpus action brought by the plaintiff, a biological mother, against her own mother, the defendant, for custody of the plaintiff's two biological children. The children had been raised by the defendant since they were infants, and were 15 and 11 years of age at the time we issued our opinion. In that opinion, we discussed the wishes of the two children in reaching our conclusion that the district court had erred in awarding the plaintiff custody of the children. See *id.*

However, our discussion of the wishes of the children was relevant in that case, insofar as we had determined, as a preliminary matter, that the plaintiff had forfeited her preferential right to the custody of her biological children through persistent neglect, and

that she was not a fit and proper custodian for the children. Once it had been established that the plaintiff had forfeited her superior right, the issue before us was custody, to be determined by reference to the best interests of the children. The wishes of the children were relevant to that determination. In the instant case, however, the county court concluded that Lisa had not forfeited her superior parental right, and we have already determined that conclusion is supported by competent evidence. Thus, in this case, unlike *State ex rel. Cochrane, supra,* there is no issue presented to which Robert's preferences are relevant.

It should be noted that Robert's argument, and Patrick and Kathryn's argument in the trial court, is that Robert's testimony should have been allowed so that he could express his preferences about where to live. Obviously, there may be circumstances in which a minor child is competent to offer testimony relevant to parental unfitness or forfeiture of parental rights. However, in this case, the sole basis for which Robert's testimony was offered was to express his desire to live with Patrick and Kathryn. While Robert's desire to explain his wishes is understandable, his preferences were simply not relevant to the legal issues before the court. The court did not abuse its discretion in precluding his testimony.

### REPRESENTATION OF MINOR CHILD

In his final assignment of error, Robert argues that he should have been appointed counsel before the hearing on, and disposition of, Lisa's motion to terminate the guardianship. Section 30-2616(c) provides that if, at any time in guardianship removal proceedings, the court determines that the interests of the ward are, or may be, inadequately represented, the court may appoint an attorney to represent the minor, giving consideration to the preference of the minor if the minor is 14 or more years of age. We have stated that the appointment of a guardian ad litem for a minor child is a matter within the discretion of the trial court. See *Robinson v. Robinson,* 236 Neb. 879, 464 N.W.2d 193 (1991). Similarly, whether to appoint an attorney to represent a minor child pursuant to § 30-2616(c) is also a matter entrusted to the discretion of the trial court.

We find no prejudicial error to be present in this case. There is no evidence in the record to suggest that Robert's interests were

inadequately represented by the parties and the guardian ad litem, nor does Robert's appellate brief explain how independent representation for Robert would have affected these proceedings. Simply stated, Robert has not offered any argument showing what, if anything, an attorney representing him would have done to add to the hearing. In the absence of any evidence supporting the appointment of an attorney pursuant to § 30-2616(c), and any showing of prejudice resulting from the failure to make such an appointment, we find no prejudicial abuse of discretion.

We do note, although it is not expressly discussed by the parties, that the court erred in suggesting to the guardian ad litem that he "should also perform the duties of counsel for the juvenile and to express and advocate for his desires, so if that would require that you do some questioning, we'll have you do some questioning." A guardian ad litem's duties are to investigate the facts and learn where the welfare of his or her ward lies and to report these facts to the appointing court. *Betz v. Betz*, 254 Neb. 341, 575 N.W.2d 406 (1998). A guardian ad litem may be an attorney, but an attorney who performs the functions of a guardian ad litem does not act as an attorney and is not to participate in the trial in an adversarial fashion such as calling or examining witnesses or filing pleadings and briefs. *Id.* In contrast, an attorney appointed under § 30-2616(c) is an advocate for the minor child and is not a guardian ad litem. Cf. *Betz, supra.* The court-appointed attorney shall act as the attorney for the minor child, but shall not testify in the proceedings. See *id.* Consequently, the court erred in suggesting the guardian ad litem could serve both as guardian ad litem and an advocate for Robert.

However, the record affirmatively demonstrates that no prejudice resulted from this erroneous suggestion. The guardian ad litem's participation in these proceedings was limited to supporting Patrick and Kathryn's offer of proof with respect to Robert's proffered testimony, testifying as a witness who had interviewed Robert and the parties, and a brief closing statement urging the court to continue the guardianship. While the guardian ad litem was placed in a difficult position by the trial court's erroneous suggestion that the guardian ad litem perform inconsistent functions during the hearing, see *Betz, supra*, the record does not suggest that any of the parties were prejudiced by the error. See

*In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 598 N.W.2d 729 (1999). Thus, while these inconsistent roles prevented the guardian ad litem from acting as a substitute for counsel appointed pursuant to § 30-2616(c), for the reasons stated above, we find no reversible error.

## CONCLUSION

The county court's determination that Lisa did not forfeit her parental rights is supported by competent evidence. The county court did not abuse its discretion by not permitting Robert to testify, and did not prejudicially abuse its discretion by not appointing counsel for Robert pursuant to § 30-2616(c). The judgment of the county court, terminating Patrick and Kathryn's guardianship over Robert, is affirmed.

AFFIRMED.